**In the Matter of Ciara ROY and Richard Roy, Infants under the age of 16,**

**Richard and Ellen Hanley, Petitioners,**

v.

**Nicholas Daniel Roy, Respondent.**

No. 06–60082CIV.

United States District Court,
S.D. Florida,
Miami Division.

May 5, 2006.

Lawrence S. Katz, Esq., Miami, FL, for Plaintiffs.

Dori Foster–Morales, Esq., Elser & Foster Morales, Miami, FL, for Defendants.

### ORDER GRANTING RESPONDENT'S MOTION TO DISMISS PETITION

MORENO, District Judge.

## I. INTRODUCTION

The petitioners are the Irish grandparents of three children, two of whom are minors, and they allege that the minors were wrongfully removed to the United States from Ireland by their own father, the respondent. There is no dispute about the father's custodial rights over the children. Instead, the dispute revolves around whether the removal of the children by their own father with custodial rights from Ireland to the United States was wrongful under the Hague Convention on the Civil Aspects of International Child Abduction.

The Irish grandparents rely on a will (petitioners' exhibit #5 and attached to this order) executed by the children's mother (the daughter of the petitioners and wife of the respondent) ten days before she died of cancer in Ireland. This will allegedly gives joint guardianship rights to the grandparents and the father. Under Irish law, a testamentary guardian can act jointly with the surviving parent unless the parent objects. The father, who now lives in Florida with his three children, has objected. He personally objects to the maternal grandparents' request that the two minors be compelled to return to Ireland where the grandparents live, and where the children and father lived for five years after the mother's death.

The Court finds that the sole surviving parent's removal of his own children to the United States to live near the paternal grandparents was not wrongful under the law. Furthermore, the will, allegedly appointing the grandparents as additional guardians, cannot trump the custodial rights of a fit father. Absent a court order from Ireland compelling the children to remain in Ireland with their grandparents, the Court cannot use the Hague Convention to separate the minor children from their sole surviving parent. Therefore the Petition is dismissed.

## II. BACKGROUND FACTS

On July 29, 2005, the respondent Nicholas Daniel Roy ("the father") moved from Ireland to the United States with his three children, Danielle (age 16), Ciara (age 13), and Richard (age 9). The father and the

children had been living in Ireland since 1997, along with the children's mother, the father's wife ("the mother"). Prior to 1997, the family resided in England. However, the family moved to Ireland after the mother was diagnosed with cancer and chose to live near her Irish family. The mother unfortunately passed away in November 2000, and the father and children continued to live in Ireland, where the children attended school and the father was employed until 2005.

While in Ireland, the father and children lived in the home of the petitioners, the maternal grandparents ("the grandparents"). The father worked full time in the two years following the mother's death, and thereafter, he worked on a part-time basis and spent the rest of his time taking care of his children. The father paid for some household expenses, and the grandparents paid for the children's school tuition. The grandparents have admirably continued to offer much financial support.

Ten days before the mother died, on October 27, 2000, she executed a will in Ireland. She had also previously executed a will in England. In the Irish will, the mother stated, "I appoint the Said Richard Hanley and Ellen Hanley to be Guardians of my infant Children." This Irish will was probated on August 20, 2003. There is much dispute as to whether the father was aware of the Irish will and the appointment of guardianship to the grandparents. However, it is conceded that a copy of the will was provided to the father by the Irish Central Authority in December of 2005. Furthermore, it is this will and the appointment of guardianship on which the grandparents base their Hague Convention claim.

## III. ANALYSIS

The Grandparents argue that the children were wrongfully removed from their Irish home in violation of the 1980 Hague Convention on the Civil Aspect of International Child Abduction and 42 U.S.C. § 11603(b), the International Child Abduction Remedies Act. The stated purposes of the Hague Convention are (1) "to secure the prompt return of children wrongfully removed to or retained in any Contracting State," and (2) "to ensure that the rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States." *See* Hague Convention ("HC"), Art. 1. In sum, "the objective is to spare children already suffering the effect of the breakdown in their parents' relationship the further disruption which is suffered when they are arbitrarily taken by one parent from their settled environment and moved to another country." Re O .(Child Abduction: Custody Rights) [1997] 2 FLR 702 (High Court, Eng.). In furthering these purposes, the Hague Convention's remedy is returning children to their country of habitual residence. This remedy is intended to "reestablish the pre-abduction status quo and to deter parents from international forum shopping. in custody disputes." *Lalo v. Malca,* 318 F.Supp.2d 1152, 1154 (S.D.Fla. 2004).

### A. Wrongful Removal

In this Motion to Dismiss the Petition, the father argues that a Court can only order this remedy, which would be the return of the children to Ireland in this case, if the Court determines that the children were wrongfully removed in the first place. It is the petitioners' burden to prove wrongful removal by the preponderance of the evidence, and the father argues that petitioners have failed to meet this burden. Under Article 3 of the Hague Convention, removal is wrongful when

(1) it is in breach of rights of custody . . . under the laws of the state in which the child was habitually resident imme-

diately before the removal or retention, and

(2) at the time of removal or retention those rights were actually exercised ... or would have been so exercised but for the removal or retention.

HC, Art. 3. Therefore, to establish wrongful removal, the grandparents must show that they had rights of custody in regard to the children and that they were exercising those rights when the father removed the children to the United States in July of 2005.

### B. Rights of Custody

The Convention states that " 'rights of custody' shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." HC, Art. 5. Furthermore, "rights of custody ... may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of the State." HC, Art. 3. Courts have generally construed "rights of custody" broadly to accomplish the abovementioned purposes of the Hague Convention. *See* Re O, *supra;* Re B (A Minor) (Abduction) [1994] 2 FLR 249 (Eng.).[1] In *Re O,* the Court held that determining whether a parent has rights of custody is discretionary and may be based on the circumstances if a parent is acting with parental duties but does not have the benefit of a court order granting official custodial status. The Court held that the petitioners, who were grandparents, had rights of custody under the Hague Convention because they had taken on "full parental responsibilities over a substantial period of time." *See* Re O, *supra.*

In so holding, the *Re O* court relied heavily on *Re B.* In *Re B,* the biological father of F, who was a child of non-marital parents, alleged that F had been wrongfully removed from Australia by her mother. The father's paternity did not give him automatic rights of custody as to F since F was born out of wedlock. However, the Court held that the father had established rights to custody as follows:

He had acquired rights amounting for Convention purposes to 'rights of custody'—first through his active role in the care of the child, secondly through the status which the mother and the grandmother had themselves accorded to him as a party whose consent was necessary before F could be removed from the jurisdiction or issued with a passport, and thirdly through the rights recognized or accorded to him when the mother signed the second minute.

Re B, *supra.* Like the grandparents in *Re O,* the father was granted rights because he took full parental responsibility for F while her mother lived abroad. In addition, his parental rights were accepted by F's other caretakers, and he was given rights through an agreement (the minute) signed by F's mother.

In this case, the grandparents cite to this broad understanding of rights of custody. They allege that they have rights of custody to the children based on (1) a will signed by the mother ten days before her death, and (2) Articles 7(2), 7(3), and 10(2)(a) of the Guardianship of Infants Act of 1964. Specifically, the grandparents allege that the will appointed them testamentary guardians of the children, and that as testamentary guardians, they have rights of custody over the children.

---

**1.** The judicial "opinions of our sister signatories" to the Convention are "entitled to considerable weight." *See Air France v. Saks,* 470 U.S. 392, 404, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985).

Section 7 of the Guardianship of Infants Act describes the power of a father or mother to appoint testamentary guardians. The relevant language of section 7 is as follows:

(2) The mother of an infant may by deed or will appoint a person or persons to be guardian or guardians of the infant after her death.

(3) A testamentary guardian shall act jointly with the surviving parent of the infant so long as the surviving parent remains alive unless the surviving parent objects to his so acting.

(4) If the surviving parent so objects ... the testamentary guardian may apply to the court for an order under this section.

Here the mother appointed the grandparents as testamentary guardians under her will. She wrote, "I appoint the said Richard Hanley and Ellen Hanley (the grandparents) to be guardians of my infant children." However, the real question for the Court is whether this appointment of testamentary guardianship confers upon the grandparents rights of custody under the Hague Convention. The Court holds that, in this case, the testamentary guardianship does not confer rights of custody for two reasons: (1) the mother appointed the grandparents to be guardians and not custodians, which she could have done, and more importantly (2) the father has objected to joint guardianship with the grandparents as is his right under section 7(3).

### 1. Guardianship vs. Custody

In Ireland, there is a distinction between guardianship and custody. Judge Finlay Geoghegan describes the difference between the two concepts in *F.N. and E.B. v. C.O.*, 4 IR 311, 318 (High Court, Ireland, 2004), a case where grandparents sought to be appointed guardians of their grand-

children when the mother died without appointing testamentary guardians:

Guardianship describes the group of rights and responsibilities automatically vested in parents of a child born within marriage and in the mother of child born outside of marriage in relation to the upbringing of the child .... Guardianship encompasses the duty to maintain and properly care for a child and the right to make decisions about a child's religion and secular education, health requirements and general welfare. The right to custody of child is one of the rights that arises under guardianship relationship.

Custody essentially means the right to physical care and control. Married parents residing together are the joint guardians and custodians of their children. If they separate, custody vests in the parent with whom the child primarily resides. The parent deprived of custody as a result of marital breakdown still remains a guardian and is entitled to continue to be involved in making decision about the upbringing, welfare, and development of the child.

*Id.* (quoting *Shatters Family Law* (4th ed.)); *see also* Guardianship Act, Sec. 10. In other words, guardianship is a "more global responsibility" and even though it is possible to be both a guardian and custodian, "it is not necessary that the guardian of a child be also its custodian and day-to-day caretaker."[2]

In this case, the grandparents were not automatically vested with guardianship of the children. Instead they were appointed guardians in the mother's will. The appointment must be read literally and with the understanding that guardianship and custody are different. That is, guardianship does not have to include custody. Because the mother's will specifically states

---

2. Geoffrey Shannon, *Child Law,* § 2–40, p. 46  (2004).

that she is appointing the grandparents to be "guardians" of her infant children, this Court will not read into that language any greater rights or responsibilities, including custody.

Furthermore, this reading of the will is consistent with *Re O* and *Re B*, despite those cases' broad reading of rights of custody. In *Re O* and *Re B*, the petitioner alleging rights of custody had exercised *full parental responsibility* over the children in question. The grandparents in *Re O* had been fully responsible for the child for over fourteen months; while the father in *Re B* took care his child in Australia while the child's mother lived in England. In contrast, the grandparents here mainly testified to financial support for the children. *See* Petitioners' Aff. ¶ 23. At no time, since the mother's death, were they fully responsible for the day-to-day care of the children. That responsibility remained with the father.

### 2. Objection by Surviving Parent

Even if the grandparents' guardianship had included rights of custody, their rights as to both guardianship and custody were abrogated when the father objected to their joint guardianship.[3] Section 7(3) of the Guardianship of Infants Act states, "A testamentary guardian shall act jointly with the surviving parent of the infant so long as the surviving parent remains alive *unless the surviving parent objects to his so acting.*" *See* Guardianship Act, Sec. 7(3) (emphasis added). If the surviving parent does object, then under section 7(4),

it is up the testamentary guardian to go to court to enforce his guardianship rights. Furthermore, "in such a case, the testamentary guardian cannot act as guardian unless, on application to the court, the court grants an order that the testamentary guardian shall act as guardian."[4] In other words, the rights of the testamentary guardian are subject to agreement by the surviving parent unless superseded by a court order. Without agreement or a court order, the testamentary guardians simply do no have the right to act.

In this case, the grandparents failed to go to an Irish court to enforce their guardianship rights and therefore they "cannot act as guardian" to the children. Since the grandparents cannot act as guardians without a court order, they certainly do not have rights of custody under the Hague Convention. At no time between the mother's death and the father's departure to the United States did the grandparents ever seek a court order enforcing their rights, and as testamentary guardians, the grandparents did have the right to go to court and formalize their guardianship. *See* Guardianship Act, Section 11 ("Any person being a guardian of an infant may apply to the court for its direction on any question affecting the welfare of the infant and the court may make such order as it thinks proper."). In addition, the grandparents have not gone to court in Ireland following the removal of the children. The opportunity get a court order following an alleged wrongful removal is

---

**3.** There is some dispute as to when the father actually objected and whether he was aware of the grandparents' appointment as testamentary guardians. This dispute need not be settled by this court, however, because the Court is satisfied that the father constructively objected when he left Ireland for the United States with his children in July 2005.

**4.** *See* Geoffrey Shannon, *Parental Responsibilities, National Report: Ireland, Law Society of*

*Ireland, Dublin, available at www2.law.uu.nl/priv /cefl/Reports/pdf2/ Ireland.pdf.* Mr Shannon is the Deputy Director of Education at the Law Society of Ireland and lectures in Family Law, Child Law and Health and Safety Law. He is also the editor of the Irish Journal of Family Law and has published extensively on various issues of Irish Family Law. He is obviously an expert on Irish law and his analysis was cited by Petitioners.

provided by Section 15 of the Child Abduction and Enforcement of Custody Order Act, which states, "The Court may, on an application made for the purposes of Article 15 of the Hague Convention by any person appearing to the Court to have an interest in the matter, make a declaration that the removal of any child from, or his retention outside, the State was wrongful within the meaning of Article 3 of that Convention."

Despite these rights to go to court, the grandparents never went to court and have no court order confirming their guardianship or custody rights in view of the father's objection to joint guardianship over the children. The grandparents put forth several reasons why they did not seek a court order; however, their reasons are unpersuasive. First, the grandparents argue that an initial custody proceeding was unnecessary since no issue had arisen between the parties. *See* Hennessy Aff. ¶ 18. It is possible that the grandparents were lulled into a false sense of security considering the fact that the father and children continued to live with them for five years following the mother's death. However, the grandparents would be unreasonable in believing that the father would always want to live with them. It is likely that at some point, the father would want to live in his own home with his family. Therefore, the only way for the grandparents to ensure their testamentary guardian rights over the children would be to get a court order from an Irish court.

The grandparents also argue that getting an Irish court order following the alleged wrongful removal would have amounted to a "chasing order." According to the grandparents, chasing orders are unnecessary as they provide little or no advantage to the parties seeking relief under the Hague Convention. A chasing order is an order sought by a party seeking return of a child that grants custody of the child to that party after the child has already been removed from the jurisdiction. *See* Petitioners Ex. On Chasing Orders, " § 4.13 Rights of Custody— "Chasing Orders". The main concern over chasing orders is that they complicate matters in that "the Hague Convention seeks to return the child to the *status quo* that existed before the wrongful removal," and "that objective cannot be accomplished the if the courts of the habitual residence have issued a custody order changing the status quo." *Id.*

This concern, however, does not exist in this case. The order, which the grandparents could have sought under Section 15 of the Child Abduction and Enforcement of Custody Order Act, would have only declared the removal to be wrongful and possibly that the grandparents are entitled to joint guardianship if the court held that the father had yet to object to their testamentary guardianship. The *status quo* would not have changed and a "chasing order" in this unique case would have only helped the grandparents' case.

## IV. CONCLUSION

Based on the foregoing, the father's Motion to Dismiss the Petition is GRANTED. The father has objected to the maternal grandparents' testamentary guardianship over his children. Therefore, the grandparents have no rights of custody under the Hague Convention and this Court lacks jurisdiction to hear their allegations. The maternal grandparents are free to use the Irish courts to enforce any rights that they may have under Irish law.

Exhibit

THE HIGH COURT

PROBATE

BE IT KNOWN, that on the 20th day of August 2003 the last Will a copy of which,

signed by me is hereunto annexed, of MARGARET HANLEY–ROY late of Kilmeedy, in the County of Limerick

Business Woman

deceased, who died on or about the 7th day of November 2000 at Ballinruan, Kilmeedy, in the County of Limerick and who at the time of death had a fixed place of abode at Kilmeedy, in the County of Limerick within the District of this Probate Registry was proved, and registered in the District Probate Registry at Limerick and that the Administration of all the estate which devolves on and vests in the personal representative of the said deceased was granted by the Court to RICHARD HANLEY of Glebe House, New Park, Croagh, in the County of Limerick, Company Employee, father of the deceased and ELLEN HANLEY of Glebe House, New Park, Croagh, in the County of Limerick, Married Woman, mother of the deceased the Executors named in the said Will they having been first sworn faithfully to administer the same.

*And it is hereby certified that an Affidavit for Inland Revenue has been delivered wherein it is shown that the gross value of all the Estate of the said deceased within this jurisdiction (exclusive of what the deceased may have been possessed of or entitled to as a Trustee and not beneficially) amounts to Eur 418,397.56 and that the net value thereof amounts to Eur 195,-657.53*

And that it appears by a Certificate issued by the Revenue Commissioners that the payment of Inheritance Tax has been deferred

I Margaret Hanley–Roy of Kilmeedy, in the County of Limerick make and declare this writing as and for my last Will and testament hereby revoking all former Wills and testamentary dispositions heretofore made by me in the Republic of Ireland but not any other Will or Testamentary disposition heretofore made by me. And I declare this to be my last Will for the purpose only of disposing of property belonging to me situate being or arising in the Republic of Ireland.

I nominate, constitute and appoint my Father, Richard Hanley and my Mother Ellen Hanley both of "Glebe House", Newpark, Croagh, Co. Limerick (hereinafter called "My Trustees") to be Executors and Trustees of this my Will and I appoint them Trustees for the purposes of the Settled Land Acts. Conveyancing Acts and Section 57 of the Succession Act, 1965 and I appoint the Said Richard Hanley and Ellen Hanley to be Guardians of my infant Children.

I direct that the Power of appointing a new Trustee whether additional or substitutional shall be vested in my Trustees for the time being or in the survivor or survivors of them or in the Legal Personal Representative of the last of my Trustees to survive.

In connection with all my Estate both real and personal, whatsoever and wheresoever situate my Trustees shall have power to hold the same or the sell the same if they shall think fit.

I will devise and bequeath my property at Ballinruane, Kilmeedy, Co. Limerick unto my Trustees In Trust for my daughter, Ciara Roy to be appointed to her when she attains the age of 25 years.

I will devise and bequeath my property at Ferndale, Kilmeedy unto my said Trustees In Trust for my son. Richard Roy to be appointed to my said Son when he attains the age of 25 years.

I will devise and bequeath my property at Ballyhahill. Ballingarry unto my said Trustees In Trust for my daughter. Danielle Roy to be appointed to her when she attains the age of 25 years.

I leave the rest residue and remainder of my Estate both real and personal to my Said Trustees and authorize and direct them to firstly pay my lawful debts, funeral and Testamentary Expenses and as to the balance then remaining to utilize same for the maintenance, benefit and Education of my three children Ciara, Richard and Danielle, in such manner as my Trustees in their absolute discretion shall think fit, until each child completes their education or attains the age of 25 years which ever event first happens.